## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **RYAN MILLER,** | : | **Civil No. 3:24-CV-946** |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | **(Magistrate Judge Carlson)** |
| | : | |
| **FRANK BISIGNANO,**[1] | : | |
| **Commissioner of Social Security** | : | |
| | : | |
| **Defendant.** | : | |

## MEMORANDUM OPINION

### I.    Introduction

The instant Social Security appeal highlights two familiar guiding tenets of law in this field. On one hand, we employ a limited scope of review when considering Social Security appeals; our task is simply to determine whether substantial evidence supports the decision of the Administrative Law Judge (ALJ). Consistent with this deferential standard of review, when, as here, we are called upon to assess whether an ALJ has sufficiently articulated a rationale for the mental and

---

[1] Frank Bisignano became the Commissioner of Social Security on May 6, 2025. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Frank Bisignano should be substituted as the defendant in this suit. No further action need be taken to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

emotional components of a claimant's residual functional capacity (RFC), we have recently been instructed that this aspect of an RFC is sufficient "as long as the ALJ offers a 'valid explanation'" for the mental and emotional limitations imposed upon a worker. Hess v. Comm'r Soc. Sec., 931 F.3d 198, 211 (3d Cir. 2019).

On the other hand, case law imposes a clear obligation upon ALJs to fully articulate their rationale when denying benefits to disability applicants. This duty of articulation is essential to informed judicial review of agency decision-making since, in the absence of a well-articulated rationale for an ALJ's decision, it is impossible to ascertain whether substantial evidence supported that decision. At a minimum, this duty of articulation requires the ALJ to draw a legal and logical bridge between any factual findings and the final conclusion denying the disability claim.

This case illustrates several aspects of this duty of articulation. First, when an ALJ's decision rests upon the opinions of state agency experts issued at the outset of the agency process:

> [C]ase law . . . cautions courts to take into account the fact that state agency non-treating and non-examining source opinions are often issued at an early stage of the administrative process. While this fact, standing alone, does not preclude consideration of the agency doctor's opinion, see Chandler v. Comm'r of Soc. Sec., 667 F.3d 356, 361 (3d Cir. 2011), it introduces another level of caution that should be applied when evaluating reliance upon such opinions to discount treating and examining source medical statements. Therefore, where a state agency non-treating and non-examining opinion does not take into account material medical developments which have occurred after the opinion

2

was rendered, that opinion often cannot be relied upon by the Commissioner to carry its burden of proof. See Batdorf v. Colvin, 206 F. Supp. 3d 1012, 1023 (M.D. Pa. 2016).

Foose v. Berryhill, No. 3:17-CV-00099, 2018 WL 1141477, at *7 (M.D. Pa. Mar. 2, 2018).

In addition, at a minimum this duty of articulation requires an ALJ to acknowledge and thoughtfully examine any treating source opinion which opines that the claimant has a greater degree of impairment than that found by the ALJ. Therefore:

> "[An] ALJ's complete failure to analyze, address or even acknowledge [a] treating source opinion which conflicted with the ALJ's residual functional capacity analysis, and recommended [a claimant] for 'full disability,' compels a remand ...."

O'Hara v. Dudek, No. 3:23-CV-00671, 2025 WL 861397, at *9 (M.D. Pa. Mar. 19, 2025) (quoting Harrison v. Berryhill, No. 3:17-CV-618, 2018 WL 2051691, at *5 (M.D. Pa. Apr. 17, 2018), report and recommendation adopted, No. 3:17CV0618, 2018 WL 2049924 (M.D. Pa. May 2, 2018); citing Saltos v. O'Malley, No. 3:24-CV-006, 2024 WL 3794679, at *10 (M.D. Pa. Aug. 13, 2024); Seibert v. Saul, No. 1:18-CV-10, 2019 WL 4439653, at *7 (M.D. Pa. Aug. 28, 2019), report and recommendation adopted, No. 1:18-CV-10, 2019 WL 4420578 (M.D. Pa. Sept. 16, 2019)).

These principles control here and in our view, call for a remand of this case. The plaintiff in this case, Ryan Miller, suffered from a cascading array of emotional impairments. Five experts opined on the degree to which these impairments precluded work: two non-treating, non-examining state agency experts and three treating sources. With respect to these opinions, the treating source consensus agreed that Miller's impairments were significantly more severe than the state agency experts suggested. Notwithstanding this treating source consensus, the ALJ found the state agency opinions more persuasive, but in doing so committed an error of articulation: The ALJ failed to analyze, address or even acknowledge the existence of one treating source opinion. Thus, we cannot determine whether the ALJ rejected, or simply failed to recognize, this medical opinion. Further, the ALJ's reliance on these non-examining source opinions which were issued at an early stage in the administrative process is misplaced since these experts did not have the opportunity to consider other, subsequent material medical developments. Upon consideration, as discussed below, these failures of articulation now calls for a remand of Miller's case in order to allow the ALJ to specific consider and address all of the treating source opinions in this case.

4

## II.    <u>Statement of Facts and of the Case</u>

### A. <u>Miller's Mental Impairments</u>

On December 9, 2021, Ryan Miller filed a Title II application for a period of disability and disability insurance benefits under the Social Security Act, alleging disability beginning March 18, 2020. (Tr. 17). In this application Miller alleged that he was disabled primarily[2] due to the following severe impairments: obsessive compulsive disorder, generalized anxiety disorder, and major depressive disorder. (Tr. 20). Miller was born on October 7, 1983, and was 36 years old on the alleged disability onset date, making him a younger individual under the Commissioner's regulations. (Tr. 25). He possessed a high school education and had prior employment as a liquor store assistant manager, liquor store clerk, maintenance worker, and a salesclerk. (<u>Id.</u>)

With respect to the severity of these emotional impairments, the ALJ summarized the information provided by Miller and his spouse in the following terms:

> The claimant alleges disability due to obsessive compulsive disorder, generalized anxiety disorder, depression, a weak pelvic floor,

---

[2] Miller also alleged that he suffered from a number of physical impairments which the ALJ found to be non-severe. (Tr. 20). Because we find that the failure to adequately consider evidence, including medical opinion evidence, relating to his mental state compels a remand, our decision focuses on the evidence regarding these emotional impairments.

hypertension, hyperlipidemia, gastroesophageal reflux disease, migraine, insomnia, and night terrors. The claimant also reported his height and weight as consistent with obesity (Exhibit 1E). Due to his impairments, the claimant stated he has difficulty squatting, bending, reaching, remembering information, completing tasks, concentrating, understanding, following instructions, and getting along with others. The claimant reported that his mind is no longer able to focus on everyday tasks; he struggles to pay attention; he does not handle stress or changes in routine well; he is afraid to sleep during the night-time; and must spend three hours per day in the shower to keep clean. The claimant alleges he is unable to work because he must perform compulsive rituals throughout every day in order to try and control his anxiety and fears; his rituals are very time consuming (Exhibits 6E, 10E; Hearing Testimony).

Gina Miller, the claimant's wife, also submitted statements to the record indicating the claimant is unable to work due to severe anxiety, panic attacks, and compulsions/obsessions that make it hard for him to leave the house, prepare food, manage money, or even complete basic tasks. She reported his anxiety occasionally keeps him from getting out of bed and his showering rituals take hours, causing him to be unable to manage his time or keep to any type of schedule.

(Tr. 22-23).

Miller's clinical treatment records, while mixed, also confirmed that he experienced significant mental health symptoms due to his emotional impairments.

As the ALJ explained:

The claimant's medical records demonstrate the claimant stopped work at the time of his alleged onset date due to a significant increase in anxiety at the start of the COVID-19 pandemic (Exhibit 2F, page 12). At that time, the claimant was reporting increased anxiety, including frequent panic attacks (Exhibit 2F, page 21). Although the claimant was observed to present with significant anxiety during his examinations (Exhibits 2F, 3F), the claimant continued to receive medication

6

management only through his family provider and did not seek a referral to psychiatry until February 2021 (Exhibit 3F, page 6).

In May 2021, the claimant presented for a psychiatric evaluation complaining of anxiety with obsessive compulsiveness and intrusive thoughts. The claimant also endorsed depressive symptoms including depressed mood, hopelessness, worthlessness, anhedonia, sleep changes, excessive guilt, decreased energy, decreased concentration/attention, and appetite changes. The claimant also reported he had been seeing a therapist every two weeks for the past year. On mental status examination, the claimant presented with depressed mood, but his attention span and memory were intact; his fund of knowledge was normal; and his insight and judgment were good (Exhibit 7F, pages 1-4). The claimant was provided changes to his medication regimen (Exhibit 7F, page 5).

Within two months on his new regimen, the claimant reported his symptoms were improving and that he was not having any adverse side-effects (Exhibit 7F, page 13). Ongoing psychiatric records show further improvements in the claimant's anxiety through 2021 (Exhibit 7F). In early 2022, the claimant reported worsening anxiety symptoms, noting he was anxious about recent changes to his medications (Exhibit 7F, page 35). However, at his appointment in March 2022, the claimant reported his symptoms were again improving (Exhibit 10F, page 3).

The claimant's outpatient therapy records suggest the claimant reported an inability to maintain health relationships with others outside of his home, difficulty sustaining attention and concentration, and impaired memory (Exhibit 14F). Later therapy notes show the claimant presented as scattered and unable to stay on task during sessions (Exhibit 24F).

Between April 2023 and May 2023, the record shows the claimant also attended group therapy as part of a partial hospitalization program (Exhibit 29F).

Despite the claimant's allegations of severely limiting anxiety and compulsions, the claimant's mental status examinations continued to show linear and goal directed thought processes and thought content

that remained devoid of delusions, obsessions, or phobias. Additionally, the claimant's attention and concentration have remained intact; his intelligence continued to appear average; his insight and judgment remained good; and the claimant continued to show fair impulse control (Exhibits 7F, 10F, 25F, 26F). The claimant's psychiatric records show he remains diagnosed with generalized anxiety disorder, major depressive disorder, and mixed obsessional thoughts and acts (Exhibits 7F, 10F), for which the claimant was advised to attend an OCD group (Exhibit 10F).

(Tr. 23-24).

## B. <u>The Medical Opinion Evidence</u>

Given this clinical picture, as many as six medical and vocational experts opined regarding the disabling effects of Miller's emotional impairments, although only four of these opinions were acknowledged and addressed by the ALJ in his decision denying this claim.

At the outset, in March of 2022, at an early stage of the administrative process, a non-treating, non-examining source, Dr. George Ondis, opined that Miller was mildly impaired in terms of his ability to understand, remember, or apply information, and was moderately impaired with respect to his ability to interact with others; persist, or maintain pace; or adapt or manage himself. (Tr. 70). Dr. Ondis also specifically found that Miller "would be able to maintain regular attendance and be punctual within reasonable expectations" and further found that:

The claimant is capable of completing tasks within a schedule and at a consistent pace for routine and repetitive tasks. The claimant can make

8

> simple decisions for routine and repetitive tasks. The claimant is able to carry out short and simple instructions. The claimant is able to maintain concentration and attention for reasonably extended periods when performing simple and repetitive tasks. . . . . The claimant would not require special supervision in order to sustain an ordinary routine when performing simple and repetitive tasks.

(Tr. 72).

Notably, Dr. Ondis' March 2022 assessment preceded, and therefore did not evaluate, three different treating source opinions which found that Miller experienced a greater level of emotional impairment. Dr. Ondis also did not have the benefit of extensive medical records which post-dated March of 2022, including records relating to Miller's partial hospitalization in April of 2023.

On August 26, 2022, a second non-treating, non-examining source, Dr. John Gavazzi, reached similar conclusions regarding the extent to which Miller's emotional impairments were disabling. (Tr. 81). According to Dr. Gavazzi:

> The claimant can make simple decisions. The claimant would be able to maintain regular attendance and be punctual. The claimant can carry out very short and simple instructions. The claimant can perform one- and two-step tasks.

(Tr. 83).

However, once again, Dr. Gavazzi reached these conclusions without the benefit of considering subsequent treating source opinions which found that Miller suffered from a greater degree of impairment and this non-examining source did not

have an opportunity to consider the medical records which post-dated August of 2022, including records relating to Miller's partial hospitalization in April of 2023.[3]

These relatively benign state agency opinions stood in stark contrast with three subsequent treating source opinions, none of which were addressed by the state agency experts and only two of which were acknowledged by the ALJ in this case. For example, on February 1, 2023, James Eash, a Licensed Social Worker who had treated Miller for a year completed a Mental Impairment Questionnaire in this case. (Tr. 669-77). In his questionnaire responses, Mr. Eash concluded that Miller suffered from an obsessive compulsive disorder, (Tr. 670); identified multiple symptoms exhibited by Miller, (Tr. 673-74); reported that Miller was unable to maintain attention and attendance or accept instructions, (Tr. 675); and found that Miller would be off-task more than 20% of the time and would miss work four or more

---

[3] There is a further enigmatic aspect to these state agency opinions and the ALJ's decision. While neither Dr. Ondis nor Dr. Gavazzi had the opportunity to assess after-acquired clinical and medical opinion evidence, both of these state agency experts stated that they considered the June 2021 opinion of Kelly Dague, a Vocational Rehabilitation Counselor, who addressed Miller's lack of work tolerance, work skills, communication skills and interpersonal skills, all of which were seen by Dague as potential barriers to full time employment. (Tr. 457-58). However, even though the state agency experts both expressly recognized Ms. Dague's assessment as a relevant opinion relating to the question of disability, the ALJ's decision never evaluated the persuasive power of this opinion.

days each month. (Tr. 676). Eash characterized Miller's impairments as "significant to severe." (Tr. 677).

Likewise, on December 8, 2022, Miller's treating physician, Dr. Mary Davies, competed a Mental Impairment Questionnaire relating to Miller. (Tr. 630-36). Dr. Davies reported that Miller suffered from moderate to severe depression and OCD, (Tr. 631), which the doctor believed limited his performance in every realm of workplace activity. (Tr. 634). Notably, Dr. Davies agreed with Mr. Eash and also opined that Miller's condition would result in significant work absenteeism, stating that he would miss two to three days of work each month. (Tr. 635).

While the state agency experts never had the benefit of these treating source observations when rendering their opinions, the ALJ acknowledged the existence of these two opinions in the decision denying benefits to Miller. (Tr. 24-25). However, curiously, neither the ALJ nor the state agency experts ever considered two other treating source opinions, both of which strongly suggested that Miller's emotional impairments were disabling.

On August 17, 2022, Erin Waltz, a licensed professional counsellor submitted a medical opinion based  her two years of clinical treatment experience with Miller. Citing these results of testing she had performed, (Tr. 609-14), Ms. Waltz provided a grave account of Miller's emotional state, explaining that:

Ryan Miller began outpatient therapy with Counseltations on April 30, 2020. He has completed 52 therapy sessions with Erin Waltz, MS, NCC,LPC over the past two years. Mr. Miller's diagnosis is Obsessive Compulsive Disorder (f.42), Generalized Anxiety Disorder (f.41.1) and Major Depressive Disorder, recurrent, moderate (f.33.1). Mr. Miller was referred by myself to access another clinician to assist with the OCD diagnosis and has been under treatment by Mr. Jim Eash, in addition to my session due to the significant impact the OCD has had on Mr. Miller's functioning. Additionally, Mr. Miller sees a psychiatrist for medication management with Dr. Apwinder Kaur. With all of these therapeutic services, Mr. Miller is still unable to maintain healthy relationships with others outside of his home and function as a working adult. He has consistently participated and still has not been able to maintain employment due to this mental health since 2020. Based on two years of treatment, it is my professional opinion that Mr. Miller is permanently disabled and unable to be employed.

Mr. Miller has an extreme fear of sweating because they cause blemishes, then he is compelled to mirror monitor for hours to monitor the blemishes, which then lead to back pain and neck issues. At one point he attempted to do Door Dash as a food delivery person however, his back pains increased and also his anxiety to the point of having panic attacks during deliveries. He has gained 40 lbs. of weight during these past years due to the depression and joined a pre-diabetic nutritional program and then had to leave the group because of his obsessions with food, causing more anxiety than assistance. His sleep is disturbed due to his anxiety disorder and he is unable at this time to have a "typical" sleep schedule, which interferes with daily work scheduled, even with a modified work schedule being recommended in the past. Working with coworkers and supervisors has been difficult for Mr. Miller as many do not understand the mental health disabilities he has and how they affect him. Typically employers are initially understanding but quickly lose empathy for the degree of impairment Mr. Miller has demonstrated. Cognitively, Mr. Miller has impaired memory and concentration to complete tasks. He loses focus and frequently asks for directions to be repeated which over time annoys coworkers and supervisors.

Assessments Administered: WHODAS-2 12 pt. scale and Beck Anxiety Inventory

Assessment Findings: WHODAS-2 scored 38 which is in the severely-completely disabled category; BAI scored 49 which is in the concerning levels of anxiety category.

(Tr. 615-16).

Remarkably, this treating source opinion—which was based upon testing data, grounded upon two years' clinical experience, and found that "Mr. Miller is permanently disabled and unable to be employed"—was never mentioned by the ALJ in the decision denying benefits to the plaintiff.

Likewise, the ALJ's decision did not address, analyze or even acknowledge a second treating source opinion rendered by Shannon Weise LCSW on April 4, 2023, which described the severity of Miller's emotional impairments in the following terms:

Ryan Miller began treatment with me in October of 2022 for OCD symptoms. Ryan was seen by me for 12 sessions from October 10, 2022 - February 21, 2023. This client attended all scheduled sessions. Ryan was provided all treatment pro bono. Ryan reported issues with dependence on wife, marijuana use, panic, and over difficulty with sleep schedule and completing tasks. Ryan's OCD symptoms included health related fears, perfectionism, contamination fears, and magical thinking. Ryan exhibited poor distress tolerance. Ryan showed minimal improvement with his treatment goals of completing exposure and response prevention for his OCD. He presented as scattered and unable to stay on task during sessions. Ryan was referred for higher level of care at McLean Hospital for residential treatment. Ryan was accepted into their program and discontinued treatment at McLean Hospital after

13

a few hours. This client returned to see me for one session before discontinuing treatment.

(Tr. 758).

LCSW Weise's opinion—which received no attention in the ALJ's decision— was notable in that it discussed the decline in Miller's emotional state in the Spring of 2023, which led to the referral of Miller "for higher level of care at McLean Hospital for residential treatment," a material exacerbation of his condition which occurred after the state agency experts rendered their initial opinions in 2022.

It was against this clinical backdrop marked by treating source opinions which were never fully examined that this disability claim was heard by the ALJ.

## C. **The ALJ Hearing and Decision**

On May 17, 2023, an ALJ conducted a hearing regarding Miller's disability claim. (Tr. 33-64). Miller and a vocational expert testified at this hearing. (Id.) In her testimony the vocational expert stated that two or more work absences per month would be "work preclusive." (Tr. 60). Given the treating source consensus that Miller's workplace absenteeism would exceed these tolerances, this testimony cast further doubt upon Miller's ability to meet the emotional demands of the workplace.

Following this hearing, the ALJ issued a decision denying the plaintiff's disability application on August 2, 2023. (Tr. 14-27). In that decision, the ALJ first concluded that the plaintiff met the Act's insured requirements and had not engaged

14

in substantial gainful activity since March 18, 2020, the alleged onset date. (Tr. 19). At Step 2 of the sequential analysis that governs Social Security cases, the ALJ found that the plaintiff suffered from the following severe impairments: obsessive compulsive disorder, generalized anxiety disorder, and major depressive disorder. (Tr. 20).

At Step 3 the ALJ determined that the plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments. (Tr. 20-21).

The ALJ then fashioned the following RFC for the plaintiff:

> After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform a full range of work at all exertional levels except the claimant is limited to the performance of simple, routine tasks involving only simple, work-related decisions with few, if any, workplace changes; is unable to perform production pace work; and can only occasionally interact with supervisors, coworkers, and the public.

(Tr. 22).

Notably, in reaching this RFC assessment, the ALJ found that the initial opinions rendered by the non-treating and non-examining state agency sources were "persuasive." (Tr. 24). The ALJ then discounted the treating source opinions of Dr. Davies and Licensed Social Worker Eash. (Tr. 24-25). However, the ALJ's decision was bereft of any discussion concerning the treating source opinions of Erin Waltz,

15

a licensed professional counsellor, and Shannon Weise, LCSW, both of whom described Miller's emotional impairments as completely disabling.

The ALJ's complete failure to address or even acknowledge these opinions is entirely unexplained. Thus, we cannot discern whether the ALJ discounted, ignored, or failed to recognize the existence of these medical source statements from individuals who had extended longitudinal treatment histories with Miller. Based upon this RFC determination, which failed to consider or address multiple treating source opinions, the ALJ determined that Miller could not perform his past work but could perform other jobs that existed in significant numbers in the national economy and denied his claim. (Tr. 25-27).

This appeal followed. (Doc. 1). On appeal, the plaintiff, in part, challenges the ALJ's reliance on these non-treating, non-examining source opinions without considering the entire medical record. On the unique facts of this case, where the ALJ's decision fails to acknowledge two treating source opinions both of which supported a finding of disability, we find that the ALJ has failed to meet the duty of articulation required in Social Security appeals. Therefore, we will remand this case for further consideration and evaluation of the evidence.

## III.    Discussion

### A.    Substantial Evidence Review – the Role of this Court

When reviewing the Commissioner's final decision denying a claimant's application for benefits, this Court's review is limited to the question of whether the findings of the final decision-maker are supported by substantial evidence in the record.  See 42 U.S.C. §405(g); Johnson v. Comm'r of Soc. Sec., 529 F.3d 198, 200 (3d Cir. 2008); Ficca v. Astrue, 901 F. Supp.2d 533, 536 (M.D.Pa. 2012). Substantial evidence "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Pierce v. Underwood, 487 U.S. 552, 565 (1988).  Substantial evidence is less than a preponderance of the evidence but more than a mere scintilla. Richardson v. Perales, 402 U.S. 389, 401 (1971).  A single piece of evidence is not substantial evidence if the ALJ ignores countervailing evidence or fails to resolve a conflict created by the evidence.  Mason v. Shalala, 994 F.2d 1058, 1064 (3d Cir. 1993).  But in an adequately developed factual record, substantial evidence may be "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent [the ALJ's decision] from being supported by substantial evidence." Consolo v. Fed. Maritime Comm'n, 383 U.S. 607, 620 (1966).  "In determining if the Commissioner's decision is

supported by substantial evidence the court must scrutinize the record as a whole."

Leslie v. Barnhart, 304 F. Supp.2d 623, 627 (M.D.Pa. 2003).

The Supreme Court has underscored for us the limited scope of our review in this field, noting that:

> The phrase "substantial evidence" is a "term of art" used throughout administrative law to describe how courts are to review agency factfinding. T-Mobile South, LLC v. Roswell, 574 U.S. ——, ——, 135 S.Ct. 808, 815, 190 L.Ed.2d 679 (2015). Under the substantial-evidence standard, a court looks to an existing administrative record and asks whether it contains "sufficien[t] evidence" to support the agency's factual determinations. Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938) (emphasis deleted). And whatever the meaning of "substantial" in other contexts, the threshold for such evidentiary sufficiency is not high. Substantial evidence, this Court has said, is "more than a mere scintilla." Ibid.; see, e.g., Perales, 402 U.S. at 401, 91 S.Ct. 1420 (internal quotation marks omitted). It means—and means only—"such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Consolidated Edison, 305 U.S. at 229, 59 S.Ct. 206. See Dickinson v. Zurko, 527 U.S. 150, 153, 119 S.Ct. 1816, 144 L.Ed.2d 143 (1999) (comparing the substantial-evidence standard to the deferential clearly-erroneous standard).

Biestek, 139 S. Ct. at 1154.

The question before this Court, therefore, is not whether the claimant is disabled, but rather whether the Commissioner's finding that she is not disabled is supported by substantial evidence and was reached based upon a correct application of the relevant law. See Arnold v. Colvin, No. 3:12-CV-02417, 2014 WL 940205, at *1 (M.D.Pa. Mar. 11, 2014) ("[I]t has been held that an ALJ's errors of law denote

a lack of substantial evidence.") (alterations omitted); <u>Burton v. Schweiker</u>, 512 F. Supp. 913, 914 (W.D. Pa. 1981) ("The Secretary's determination as to the status of a claim requires the correct application of the law to the facts."); <u>see also</u> <u>Wright v. Sullivan</u>, 900 F.2d 675, 678 (3d Cir. 1990) (noting that the scope of review on legal matters is plenary); <u>Ficca</u>, 901 F. Supp.2d at 536 ("[T]he court has plenary review of all legal issues . . . .").

Several fundamental legal propositions which flow from this deferential standard of review. First, when conducting this review "we are mindful that we must not substitute our own judgment for that of the fact finder." <u>Zirnsak v. Colvin</u>, 777 F.3d 607, 611 (3d Cir. 2014) (citing <u>Rutherford</u>, 399 F.3d at 552). Thus, we are enjoined to refrain from trying to re-weigh the evidence. Rather our task is to simply determine whether substantial evidence supported the ALJ's findings. However, we must also ascertain whether the ALJ's decision meets the burden of articulation demanded by the courts to enable informed judicial review. Simply put, "this Court requires the ALJ to set forth the reasons for his decision." <u>Burnett v. Comm'r of Soc. Sec. Admin.</u>, 220 F.3d 112, 119 (3d Cir. 2000). As the Court of Appeals has noted on this score:

> In <u>Burnett</u>, we held that an ALJ must clearly set forth the reasons for his decision. 220 F.3d at 119. Conclusory statements . . . are insufficient. The ALJ must provide a "discussion of the evidence" and an "explanation of reasoning" for his conclusion sufficient to enable

meaningful judicial review. Id. at 120; see Jones v. Barnhart, 364 F.3d
501, 505 & n. 3 (3d Cir.2004). The ALJ, of course, need not employ
particular "magic" words: "Burnett does not require the ALJ to use
particular language or adhere to a particular format in conducting his
analysis." Jones, 364 F.3d at 505.

Diaz v. Comm'r of Soc. Sec., 577 F.3d 500, 504 (3d Cir. 2009).

Thus, in practice ours is a twofold task. We must evaluate the substance of the

ALJ's decision under a deferential standard of review, but we must also give that

decision careful scrutiny to ensure that the rationale for the ALJ's actions is

sufficiently articulated to permit meaningful judicial review.

This principle applies with particular force to legal challenges, like the claim

made here, based upon alleged inadequacies in the articulation of a claimant's

mental RFC. In Hess v. Comm'r Soc. Sec., 931 F.3d 198, 212 (3d Cir. 2019), the

United States Court of Appeals recently addressed the standards of articulation that

apply in this setting. In Hess the court of appeals considered the question of whether

an RFC which limited a claimant to simple tasks adequately addressed moderate

limitations on concentration, persistence, and pace. In addressing the plaintiff's

argument that the language used by the ALJ to describe the claimant's mental

limitations was legally insufficient, the court of appeals rejected a *per se* rule which

would require the ALJ to adhere to a particular format in conducting this analysis.

Instead, framing this issue as a question of adequate articulation of the ALJ's

20

rationale, the court held that: "as long as the ALJ offers a 'valid explanation,' a 'simple tasks' limitation is permitted after a finding that a claimant has 'moderate' difficulties in 'concentration, persistence, or pace.' " <u>Hess v. Comm'r Soc. Sec.</u>, 931 F.3d 198, 211 (3d Cir. 2019). On this score, the appellate court indicated that an ALJ offers a valid explanation a mental RFC when the ALJ highlights factors such as "mental status examinations and reports that revealed that [the claimant] could function effectively; opinion evidence showing that [the claimant] could do simple work; and [the claimant]'s activities of daily living, . . . . " <u>Hess v. Comm'r Soc. Sec.</u>, 931 F.3d 198, 214 (3d Cir. 2019).

In our view, the teachings of the <u>Hess</u> decision are straightforward. In formulating a mental RFC the ALJ does not need to rely upon any particular form of words. Further, the adequacy of the mental RFC is not gauged in the abstract. Instead, the evaluation of a claimant's ability to undertake the mental demands of the workplace will be viewed in the factual context of the case, and a mental RFC is sufficient if it is supported by a valid explanation grounded in the evidence.

### B.    <u>Initial Burdens of Proof, Persuasion, and Articulation for the ALJ</u>

To receive benefits under the Social Security Act by reason of disability, a claimant must demonstrate an inability to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can

be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A); 42 U.S.C. §1382c(a)(3)(A); see also 20 C.F.R. §§404.1505(a), 416.905(a). To satisfy this requirement, a claimant must have a severe physical or mental impairment that makes it impossible to do his or her previous work or any other substantial gainful activity that exists in the national economy. 42 U.S.C. §423(d)(2)(A); 42 U.S.C. §1382c(a)(3)(B); 20 C.F.R. §§404.1505(a), 416.905(a). To receive benefits under Title II of the Social Security Act, a claimant must show that he or she contributed to the insurance program, is under retirement age, and became disabled prior to the date on which he or she was last insured. 42 U.S.C. §423(a); 20 C.F.R. §404.131(a).

In making this determination at the administrative level, the ALJ follows a five-step sequential evaluation process. 20 C.F.R. §§404.1520(a), 416.920(a). Under this process, the ALJ must sequentially determine: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals a listed impairment; (4) whether the claimant is able to do his or her past relevant work; and (5) whether the claimant is able to do any other work, considering his or her age, education, work experience and residual functional capacity ("RFC"). 20 C.F.R. §§404.1520(a)(4), 416.920(a)(4).

22

Between Steps 3 and 4, the ALJ must also assess a claimant's residual functional capacity (RFC). RFC is defined as "that which an individual is still able to do despite the limitations caused by his or her impairment(s)." Burnett v. Comm'r of Soc. Sec., 220 F.3d 112, 121 (3d Cir. 2000) (citations omitted); see also 20 C.F.R. §§404.1520(e), 404.1545(a)(1), 416.920(e), 416.945(a)(1). In making this assessment, the ALJ considers all of the claimant's medically determinable impairments, including any non-severe impairments identified by the ALJ at step two of his or her analysis. 20 C.F.R. §§404.1545(a)(2), 416.945(a)(2).

Once the ALJ has made this determination, our review of the ALJ's assessment of the plaintiff's RFC is deferential, and that RFC assessment will not be set aside if it is supported by substantial evidence. Burns v. Barnhart, 312 F.3d 113, 129 (3d Cir. 2002); see also Metzger v. Berryhill, No. 3:16-CV-1929, 2017 WL 1483328, at *5 (M.D. Pa. Mar. 29, 2017), report and recommendation adopted sub nom. Metzgar v. Colvin, No. 3:16-CV-1929, 2017 WL 1479426 (M.D. Pa. Apr. 21, 2017); Rathbun v. Berryhill, No. 3:17-CV-00301, 2018 WL 1514383, at *6 (M.D. Pa. Mar. 12, 2018), report and recommendation adopted, No. 3:17-CV-301, 2018 WL 1479366 (M.D. Pa. Mar. 27, 2018).

At Steps 1 through 4, the claimant bears the initial burden of demonstrating the existence of a medically determinable impairment that prevents him or her in

engaging in any of his or her past relevant work. Mason, 994 F.2d at 1064. Once this burden has been met by the claimant, it shifts to the Commissioner at Step 5 to show that jobs exist in significant number in the national economy that the claimant could perform that are consistent with the claimant's age, education, work experience and RFC.  20 C.F.R. §§404.1512(f), 416.912(f); Mason, 994 F.2d at 1064.

There is an undeniable medical aspect to an RFC determination, since that determination entails an assessment of what work the claimant can do given the physical limitations that the claimant experiences. Yet, when considering the role and necessity of medical opinion evidence in making this determination, courts have followed several different paths. Some courts emphasize the importance of medical opinion support for an RFC determination and state that "[r]arely can a decision be made regarding a claimant's residual functional capacity without an assessment from a physician regarding the functional abilities of the claimant." Biller, 962 F.Supp.2d at 778–79 (quoting Gormont v. Astrue, Civ. No. 11–2145, 2013 WL 791455 at *7 (M.D. Pa. Mar. 4, 2013)). In other instances, it has been held that "[t]here is no legal requirement that a physician have made the particular findings that an ALJ adopts in the course of determining an RFC." Titterington v. Barnhart, 174 F. App'x 6, 11 (3d Cir. 2006). Further, courts have held in cases where there is no evidence of any credible medical opinion supporting a claimant's allegations of disability that "the

proposition that an ALJ must always base his RFC on a medical opinion from a physician is misguided." Cummings v. Colvin, 129 F.Supp.3d 209, 214–15 (W.D. Pa. 2015).

These seemingly discordant legal propositions can be reconciled by evaluation of the factual context of these decisions. Those cases which emphasize the importance of medical opinion support for an RFC assessment typically arise in the factual setting, like that presented here,  where well-supported medical sources have opined regarding limitations which would support a disability claim, but an ALJ has rejected the medical opinion which supported a disability determination based upon a lay assessment of other evidence. Biller, 962 F.Supp.2d at 778–79. In this setting, these cases simply restate the commonplace idea that medical opinions are entitled to careful consideration when making a disability determination, particularly when those opinions support a finding of disability. In contrast, when no medical opinion supports a disability finding or when an ALJ is relying upon other evidence, such as contrasting clinical or opinion evidence or testimony regarding the claimant's activities of daily living, to fashion an RFC courts have adopted a more pragmatic view and have sustained the ALJ's exercise of independent judgment based upon all of the facts and evidence. See Titterington, 174 F. App'x 6; Cummings, 129 F.Supp.3d at 214–15. In either event, once the ALJ

25

has made this determination, our review of the ALJ's assessment of the plaintiff's RFC is deferential, and that RFC assessment will not be set aside if it is supported by substantial evidence. <u>Burns v. Barnhart</u>, 312 F.3d 113; <u>see also</u> <u>Metzger v. Berryhill,</u> 2017 WL 1483328, at *5; <u>Rathbun v. Berryhill</u>, 2018 WL 1514383, at *6.

The ALJ's disability determination must also meet certain basic substantive requisites. Most significant among these legal benchmarks is a requirement that the ALJ adequately explain the legal and factual basis for this disability determination. Thus, in order to facilitate review of the decision under the substantial evidence standard, the ALJ's decision must be accompanied by "a clear and satisfactory explication of the basis on which it rests." <u>Cotter v. Harris</u>, 642 F.2d 700, 704 (3d Cir. 1981). Conflicts in the evidence must be resolved and the ALJ must indicate which evidence was accepted, which evidence was rejected, and the reasons for rejecting certain evidence. <u>Id</u>. at 706-707. In addition, "[t]he ALJ must indicate in his decision which evidence he has rejected and which he is relying on as the basis for his finding." <u>Schaudeck v. Comm'r of Soc. Sec</u>., 181 F. 3d 429, 433 (3d Cir. 1999).

### C.    <u>Legal Benchmarks for the ALJ's Assessment of Medical Opinions</u>

The plaintiff filed this disability application after a paradigm shift in the manner in which medical opinions were evaluated when assessing Social Security

claims. Prior to March 2017, ALJs were required to follow regulations which defined

medical opinions narrowly and created a hierarchy of medical source opinions with

treating sources at the apex of this hierarchy. However, in March of 2017, the

Commissioner's regulations governing medical opinions changed in a number of

fundamental ways. The range of opinions that ALJs were enjoined to consider were

broadened substantially and the approach to evaluating opinions was changed from

a hierarchical form of review to a more holistic analysis. As one court as aptly

observed:

> The regulations regarding the evaluation of medical evidence have been
> amended for claims filed after March 27, 2017, and several of the prior
> Social Security Rulings, including SSR 96-2p, have been rescinded.
> According to the new regulations, the Commissioner "will no longer
> give any specific evidentiary weight to medical opinions; this includes
> giving controlling weight to any medical opinion." Revisions to Rules
> Regarding the Evaluation of Medical Evidence ("Revisions to Rules"),
> 2017 WL 168819, 82 Fed. Reg. 5844, at 5867–68 (Jan. 18, 2017), see
> 20 C.F.R. §§ 404.1520c(a), 416.920c(a). Instead, the Commissioner
> must consider all medical opinions and "evaluate their persuasiveness"
> based on the following five factors: supportability; consistency;
> relationship with the claimant; specialization; and "other factors." 20
> C.F.R. §§ 404.1520c(a)-(c), 416.920c(a)-(c).
>
> Although the new regulations eliminate the perceived hierarchy of
> medical sources, deference to specific medical opinions, and assigning
> "weight" to a medical opinion, the ALJ must still "articulate how [he
> or she] considered the medical opinions" and "how persuasive [he or
> she] find[s] all of the medical opinions." Id. at §§ 404.1520c(a) and
> (b)(1), 416.920c(a) and (b)(1). The two "most important factors for
> determining the persuasiveness of medical opinions are consistency and
> supportability," which are the "same factors" that formed the

foundation of the treating source rule. <u>Revisions to Rules</u>, 82 Fed. Reg. 5844-01 at 5853.

An ALJ is specifically required to "explain how [he or she] considered the supportability and consistency factors" for a medical opinion. 20 C.F.R. §§ 404.1520c (b)(2), 416.920c(b)(2). With respect to "supportability," the new regulations provide that "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be." <u>Id</u>. at §§ 404.1520c(c)(1), 416.920c(c)(1). The regulations provide that with respect to "consistency," "[t]he more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be." <u>Id</u>. at §§ 404.1520c(c)(2), 416.920c(c)(2).

Under the new regulations an ALJ must consider, but need not explicitly discuss, the three remaining factors in determining the persuasiveness of a medical source's opinion. <u>Id</u>. at §§ 404.1520c(b)(2), 416.920c(b)(2). However, where the ALJ has found two or more medical opinions to be equally well supported and consistent with the record, but not exactly the same, the ALJ must articulate how he or she considered those factors contained in paragraphs (c)(3) through (c)(5). <u>Id</u>. at §§ 404.1520c(b)(3), 416.920c(b)(3).

<u>Andrew G. v. Comm'r of Soc. Sec.</u>, No. 3:19-CV-0942 (ML), 2020 WL 5848776, at

*5 (N.D.N.Y. Oct. 1, 2020).

Oftentimes, as in this case, an ALJ must evaluate various medical opinions. Judicial review of this aspect of ALJ decision-making is still guided by several settled legal tenets. First, when presented with a disputed factual record, it is well-established that "[t]he ALJ – not treating or examining physicians or State agency

28

consultants – must make the ultimate disability and RFC determinations." <u>Chandler</u>

<u>v. Comm'r of Soc. Sec.</u>, 667 F.3d 356, 361 (3d Cir. 2011). Thus, when evaluating

medical opinions " the ALJ may choose whom to credit but 'cannot reject evidence

for no reason or for the wrong reason.'" <u>Morales v. Apfel</u>, 225 F.3d 310, 317 (3d

Cir. 2000) (quoting <u>Mason</u>, 994 F.2d at 1066). Therefore, provided that the decision

is accompanied by an adequate, articulated rationale, it is the province and the duty

of the ALJ to choose which medical opinions and evidence deserve greater weight.

Further, in making this assessment of medical evidence:

> An ALJ is [also] entitled generally to credit parts of an opinion without
> crediting the entire opinion. <u>See</u> <u>Thackara v. Colvin</u>, No. 1:14–CV–
> 00158–GBC, 2015 WL 1295956, at *5 (M.D. Pa. Mar. 23, 2015);
> <u>Turner v. Colvin</u>, 964 F. Supp. 2d 21, 29 (D.D.C. 2013) (agreeing that
> "SSR 96–2p does not prohibit the ALJ from crediting some parts of a
> treating source's opinion and rejecting other portions"); <u>Connors v.</u>
> <u>Astrue</u>, No. 10–CV–197–PB, 2011 WL 2359055, at *9 (D.N.H. June
> 10, 2011). It follows that an ALJ can give partial credit to all medical
> opinions and can formulate an RFC based on different parts from the
> different medical opinions. <u>See e.g., Thackara v. Colvin</u>, No. 1:14–CV–
> 00158–GBC, 2015 WL 1295956, at *5 (M.D. Pa. Mar. 23, 2015).

<u>Durden v. Colvin</u>, 191 F.Supp.3d 429, 455 (M.D. Pa. 2016).

However, it is also axiomatic that this duty of articulation requires an ALJ to

acknowledge and thoughtfully examine any treating source opinion which opines

that the claimant has a greater degree of impairment than that found by the ALJ.

Therefore:

> "[An] ALJ's complete failure to analyze, address or even acknowledge [a] treating source opinion which conflicted with the ALJ's residual functional capacity analysis, and recommended [a claimant] for 'full disability,' compels a remand ...."

O'Hara v. Dudek, No. 3:23-CV-00671, 2025 WL 861397, at *9 (M.D. Pa. Mar. 19, 2025) quoting Harrison v. Berryhill, No. 3:17-CV-618, 2018 WL 2051691, at *5 (M.D. Pa. Apr. 17, 2018), report and recommendation adopted, No. 3:17CV0618, 2018 WL 2049924 (M.D. Pa. May 2, 2018), citing Saltos v. O'Malley, No. 3:24-CV-006, 2024 WL 3794679, at *10 (M.D. Pa. Aug. 13, 2024); Seibert v. Saul, No. 1:18-CV-10, 2019 WL 4439653, at *7 (M.D. Pa. Aug. 28, 2019), report and recommendation adopted, No. 1:18-CV-10, 2019 WL 4420578 (M.D. Pa. Sept. 16, 2019).

It is against these legal benchmarks that we assess the instant appeal.

## D.    This Case Will Be Remanded.

In our view, the ALJ's evaluation of this case is flawed in two fundamental ways, which combine to compel a remand. First, this decision—which relies exclusively upon state agency opinions issued at the outset of the administrative process—pays insufficient deference to the familiar proposition that:

> [C]ase law . . . cautions courts to take into account the fact that state agency non-treating and non-examining source opinions are often issued at an early stage of the administrative process. While this fact, standing alone, does not preclude consideration of the agency doctor's opinion, see Chandler v. Comm'r of Soc. Sec., 667 F.3d 356, 361 (3d

Cir. 2011), it introduces another level of caution that should be applied when evaluating reliance upon such opinions to discount treating and examining source medical statements. Therefore, where a state agency non-treating and non-examining opinion does not take into account material medical developments which have occurred after the opinion was rendered, that opinion often cannot be relied upon by the Commissioner to carry its burden of proof. See Batdorf v. Colvin, 206 F. Supp. 3d 1012, 1023 (M.D. Pa. 2016).

Foose, 2018 WL 1141477, at *7.

Here the ALJ relied upon the non-treating, non-examining source opinions to reject Miller's claim, but failed to recognize that there were significant medical developments which took place after those opinions were rendered in 2022 which undermined the reliance which could be placed upon these preliminary medical judgments. These subsequent material medical developments included Miller's partial hospitalization in 2023, and the receipt of no less than four treating source opinions which described Miller as disabled and stated that he would suffer from a rate of workplace absenteeism which the vocational expert in Miller's case testified would be work preclusive.

This analytical shortcoming, in turn, exposed a greater failure of analysis by the ALJ in this case. As we have noted "the ALJ's complete failure to analyze, address or even acknowledge [a] treating source opinion which conflicted with the ALJ's residual functional capacity analysis, and recommended [a claimant] for 'full disability,' compels a remand . . . ." Harrison, 2018 WL 2051691, at *5. Yet this is

31

precisely what has happened in the instant case. The ALJ denied Miller's claims without ever even identifying, much less evaluating, the treating source opinions of Erin Waltz, a licensed professional counsellor, and Shannon Weise, LCSW, both of whom described Miller's emotional impairments as completely disabling. The ALJ's silence on this score is puzzling and defeats any effort at reasoned assessment of the ultimate merits of this decision since we cannot ascertain whether the ALJ ignored, or rejected, these two medical opinions. This was error, and was prejudicial error since consideration of the full body of this opinion evidence significantly alters the quantum of proof supporting Miller's claim.

Simply put, more is needed here. It is axiomatic that the ALJ's decision must be accompanied by "a clear and satisfactory explication of the basis on which it rests." Cotter v. Harris, 642 F.2d 700, 704 (3d Cir. 1981). This means that there must be a logical nexus between the ALJ's factual findings and legal conclusions. That logical bridge is missing here where the ALJ fails to identify or acknowledge treating source opinions which supported this disability claim. Since the ALJ's burden of articulation is not met in the instant case, this matter must be remanded for further consideration by the Commissioner. Yet, while we reach this result, we note that nothing in this Memorandum Opinion should be deemed as expressing a judgment

on what the ultimate outcome of any reassessment of this evidence should be. Rather, the task should remain the duty and province of the ALJ on remand.

### IV.    **Conclusion**

Accordingly, for the foregoing reasons, IT IS ORDERED that the plaintiff's request for a new administrative hearing is GRANTED, the final decision of the Commissioner denying these claims is vacated, and this case is remanded to the Commissioner to conduct a new administrative hearing.

An appropriate order follows.

/s/ *Martin C. Carlson*
Martin C. Carlson
United States Magistrate Judge

Dated: October 29, 2025